E. D. SMITH v. MARY WALLACE and ROSCOE WALLACE, Appellants, and ELMER HARRIS.—119 S. W. (2d) 813.

Division One, September 17, 1938.*

*NOTE: Opinion filed at May Term, 1938, May 26, 1938; motion for rehearing filed; motion overruled at September Term, September 17, 1938.

2

*L. O. Schaumburg* and *Lamkin James* for appellants.

4

*Cave & Hulen, John H. Windsor* and *Lionel Davis* for E. D. Smith.

6

HYDE, C.—This is an action to determine title (with count in ejectment) to an island in the Missouri River. Defendant Mary Wallace answered claiming title to and admitting possession of all except a small portion (of the western part) of the land. Defendant Roscoe Wallace denied possession and made no claim of ownership. Defendant Elmer Harris claimed an undivided one-half interest in all the land by conveyance from plaintiff. Plaintiff filed a reply to answer of defendant Harris only, and plaintiff later dismissed as to him. The jury found for plaintiff and against defendants Wallace on both counts and further found that plaintiff and defendant Harris each owned "an undivided one-half interest in the land." Judgment was entered on these verdicts and defendants Wallace have appealed.

Appellants stood on their demurrer to plaintiff's evidence, offered no evidence, and contend here that plaintiff's evidence was insufficient to make a case on either count. Plaintiff's evidence (viewed most favorably to him as it must be in ruling this question) showed the following history of the land in controversy. Prior to 1914, plaintiff owned a farm in Cooper County on the shore of the Missouri River. The land joining his farm on the north and west was owned by Capt. E. T. Sites, and that on the south and east was owned by John Whittle. The lines between these farms did not follow section lines but ran at almost right-angles to a road which followed the general direction of the river northwest to southeast. About 1910, an island began to form in the river which finally extended in front of all three farms. Just how far the island then extended in front of the Whittle farm, and what the character of that part of it was in 1914, is not clear. Witnesses estimated its extent, east of the west line of the Whittle farm, from a quarter to a half mile. There was evidence that much of the lower part was "just a sand bar" and was "low and wet." Steamboats could go on either side of this island but the main channel then used was between the Cooper County shore and this island. Plaintiff and Capt. Sites both obtained deeds from Cooper County for portions of this island. The extension of the line between their farms on the shore was intended to be the dividing line between their island. Plaintiff's deed from the county, which showed no acknowledgment, recited that the land was ordered sold to him on October 10, 1914, and described, by metes and bounds, land in Section 16, Township 49, Range 18, into which plaintiff's farm on the shore extended. The tract described was of

irregular shape, 10 chains, by 13.50 chains, by 7.20 chains, by 22 chains, "containing in all 14.96 acres." This deed recited, after the description that "this is accreted land lying between the land of E. D. Smith and the Missouri River."

The land, now claimed by plaintiff, and described in his petition, consists of 543 acres. Plaintiff's description is based on a survey and plat made in 1934. According to plaintiff and his witnesses, this land lies to the south and east of the present slough which marks the 1914 channel of the river. It is a triangular tract extending almost two miles to the south and east from the Smith shore farm; the base or northern side of this tract is almost a mile long; the southern part runs to a point and varies from less than a quarter mile to more than a half mile in width throughout the lower mile of its extent. The original land described in plaintiff's deed was all in Section 16. The present island claimed by plaintiff reaches into Sections 15, 21, 22 and 27. Plaintiff's survey showed that none of it is now north of the Smith shore farm, its northwestern tip being at the northwest corner of the Whittle farm. Appellants own land south and west of the land claimed by plaintiff. In 1914, their land was an island, known as Wallace Island, and was about a mile and a half down the river from the original Smith-Sites Island. It was, after 1930, joined to the Cooper County mainland. Plaintiff's evidence was that, in 1914, the main channel of the river took the course of the slough, now marking the south and west boundary of the land he claims; that this channel was then 300 yards wide; and that this channel ran between the Smith-Sites Island and Wallace Island, putting Wallace Island on the Cooper County side of the main channel. Plaintiff said that, after obtaining his deed, he entered upon the south part of the island and used it for pasturing livestock. He built a barn on the land but high water washed into the timber. Plaintiff extended his farming operations to the southeast as the land built up and "always cleared the highest land." He said that part of the island which originally lay in front of the Whittle farm "wasn't land but just a sand bar, but finally it growed up in willows and kept filling and raising." The evidence showed that the low, wet sand bars on the southeast part gradually built higher and longer and continuously increased the size of the island in that direction.

Plaintiff's evidence further showed that a few years after 1914 the river changed its course by turning due east and cutting through the Smith-Sites Island, so that the main channel of the river, from that time on, ran around the northern and eastern sides of the part of the land conveyed to plaintiff by the county. After this change the river cut away much of the original 14.96 acre tract but plaintiff said, "there is a little bit there (while Harris occupied it) but I don't know how much." A son-in-law of Capt. Sites, former sheriff and highway engineer, testified:

8

"Q. Did that island, a part of which was purchased by Mr. Smith and part by Captain Sites, remain as one island? A. It remained as one island for several years. Q. Then what occurred? A. During a high water, a chute cut through that island. Q. How near was that chute cut to the point of division made by the surveyor? A. It was above that division line. Q. What happened to that chute that cut through the island? A. That is now the main channel of the river. Q. On whose land was this chute that cut through the island? A. It was through Captain Sites' part of the island. . . . Q. Now, Mr. McMahon, did the action of the river in cutting on the Smith part of that island ever completely cut away the portion of the island that he bought in 1914? A. It had not in 1930. . . . Q. What became of the portion of the island that was purchased by L. T. Sites? A. The (United States) Government erected five dikes on the upper end of that part of the land that was left—there was one a mile and a quarter long—and by that action joined that part of his land to the Howard County side; then on this side they made that mat, sunk it with rock and built the dike and rip-rapped the bank around the top end of the Smith Island. In other words, they put the river in the channel it appeared to have sought when it cut that island in two."

Between 1920 and 1929, plaintiff rented the whole of the island, which was all of the part cut off on the south of the original Smith-Sites Island by the change of the river channel and the land thereafter accreted to it. Plaintiff also paid taxes assessed against the island. Plaintiff named four different tenants who occupied and farmed the island as his tenants after 1920. Throughout this time the island continued to grow in size by accretion. Plaintiff said that one earlier survey showed 50 acres more land on the island than his original tract. In 1929, plaintiff made a four-year lease of the island to defendant Harris. On December 29, 1929, he conveyed an undivided one-half interest in the island to Harris. Harris did not occupy the island after 1931 because of threats made by appellant Roscoe Wallace and his brother. He testified: "In the fall (1929) three partners and myself fenced a big portion of it and put cattle on it. . . . There was one small field that Mr. Smith had—I would call it in the southwest circle of the slough on the west side of the island, that had been farmed several years before that. We made that larger and put it in corn in '30. . . . We put a one room house on it in the spring of '30 and in the winter of '30 or '31 we put another room to it." He said that did not occupy all of the island southeast of the part then fenced. Mr. Helming, one of the men who farmed the island with Harris, testified that he cleared part of the island for plaintiff in 1920 and that at that time there was 700 feet of water between the mainland and the island. He also said that, in 1920, part of the island was directly opposite plaintiff's mainland farm;

that he cleared about 18 acres for plaintiff and that none of this was in front of the Whittle farm. He further stated that there was about 30 acres of the island at that time in front of the Whittle farm. Will Smith, another of the men who farmed with Harris, said that they fenced 150 to 200 acres in 1929 but did not fence the entire island and that there was other land south and southeast of the land they fenced. He further said: "It enclosed a portion of this island there at the river on the north and circled around part of this slough and then started out through this island until we could hit the river, where it was solid ground, to keep our cattle. . . . We had the privilege to fence any part we wanted to."

In 1930 the United States government built a dike across the slough which separated the island from the mainland and which ran from the northeast corner of the Smith mainland farm to the northwest corner of the island. This caused much filling in the slough since that time. The government also built other dikes on the northern and eastern sides of the island to hold the main channel in the location that it had at that time around those sides of the island. Apparently, much of the southeastern part of the island now in dispute has accreted since the building of these government works. The 1929 deed from plaintiff to Harris recited that the island contained "200 acres more or less." Appellants (in their brief) suggest that this accretion joined plaintiff's island to Wallace Island, and that part of the 543 acres, described in plaintiff's petition, is land that was originally a part of Wallace Island and was later cut off from it. However, none of the Wallaces nor anyone else took the stand to so testify. (There was evidence that part of Wallace Island was once cut off.) On the other hand, two sons of Capt. Sites and many other witnesses who lived in the vicinity and had known the land ever since 1914 (some knew it as far back as 1890) positively testified that the slough which formed the south and east boundary of the land described had at all times since 1914 been either the river channel or a flowing branch of the river; and that it ran between plaintiff's island, and all land that accreted to it, and the original Wallace Island.

Appellants say the evidence shows that none of the 14.96 acre tract described in plaintiff's deed from Cooper County is included within the 543 acres of land described in plaintiff's petition; that all of this original description is now under water; and that, if any of this 543 acres accreted to Smith Island, it accreted to the lower part in front of the Whittle farm, in 1914, to which plaintiff never obtained any title. They state that "if the metes and bounds description of the 14.96-acre tract did in fact include what was part of an island in 1914, then the east line of that tract barred plaintiff in all events from recovering in this case, because the evidence disclosed that the island mentioned in evidence extended from a quarter

to a half mile, or more, southeasterly from the Smith mainland farm and out in front of or north and east of the John Whittle farm." Appellants also argue the impossibility of plaintiff's theory, saying that "plaintiff contends that by the miraculous change and action of the Missouri River, the 'Smith-Sites Island' was severed in twain on the boundary between him and Sites, and the Sites portion of the island traveled over into Howard County and now consists of 1,700 acres claimed by the Sites heirs, and the Smith portion traveled down the river, now consisting of 543 acres more or less, a distance of one and a half miles or two miles from its original location." Nevertheless, witnesses so testified and the jury had the right to pass upon the weight and credibility of their testimony, and to find that plaintiff's part of the original island was thus cut off, thereafter did increase in size, and change in shape, so that it now covers a different area.

Even though it be true that plaintiff acquired no title to the original southeastern part of the island (or to no part of it) by his deed, appellants were not entitled to a peremptory instruction. Plaintiff had substantial evidence to show that he had acquired title to the whole island (as it existed prior to the time he conveyed to Harris) by adverse possession. [See Sec. 11167, R. S. 1929; also Ancona Realty Co. v. Frazier, 328 Mo. 750, 41 S. W. (2d) 820.] "No more affirmative act of ownership can be asserted than the rental of the land by the plaintiff and the collection of the rents thereon. The inclosure of the same by fences at different times and the payment of taxes due on the land are, in addition to other more potential facts, persuasive evidence of actual possession." [Jamison v. Wells (Mo.), 7 S. W. (2d) 347, and cases cited; see, also, Jamison v. Wells (Mo.), 250 S. W. 63; Branner v. Klaber, 330 Mo. 306, 49 S. W. (2d) 169, l. c. 180.] Moreover, plaintiff's deed from the county was at least sufficient to constitute a color of title to the land it actually described. [Jamison v. Wells, supra; Cashion v. Meredith, 333 Mo. 970, 64 S. W. (2d) 670.] In this case, plaintiff's evidence shows that he was in possession of an island completely surrounded by so much water that, for the first ten years he held it, steamboats could go on either side of it. It had to be reached by boat at all times thereafter up to 1930 when the government built its works. There is no evidence to show prior to 1931 when plaintiff's tenants were driven off, that anyone other than plaintiff and his tenants ever held or claimed a foot of the island, either of its original extent (after it was cut off of the original Smith-Sites Island) or of the land accreted to it. If plaintiff obtained title to the original island (or the part beyond the description in his deed) by adverse possession prior to 1930, he also became owner by accretion of all land that thereafter accreted to it. [For discussion of Missouri cases see 3 Missouri Law Review 181.] If plaintiff once got title to other land in existence in 1914

southeast of his original tract by adverse possession and if this subsequently was enlarged by accretion to it, he did not lose it even though all of his first tract later washed away. He still owned the same island (even if it did change in size, shape and location) of which he had exclusive possession from the time the river cut the Smith-Sites Island into two islands. We, therefore, hold that plaintiff's evidence was sufficient to show his ownership of all of the land described in his petition, subject to the rights of defendant Harris; and that appellants' demurrer to the evidence was properly overruled.

Appellants have also assigned error in instructions given at the request of plaintiff and defendant Harris. They say these were incorrect and misleading for the same reasons urged on demurrer to the evidence as well as upon other grounds. Since plaintiff had substantial evidence to show title by adverse possession to all of the original island cut off by the change of channel, appellants' demurrer to the evidence could not be sustained merely because of plaintiff's failure to show that his deed described the entire original southeastern part of the island. However, plaintiff was not entitled to base his recovery on the theory that his deed did convey all of this land, without requiring such a finding. Some of his own evidence shows that there was land to the southeast, beyond the description in his deed which was only intended to convey part of an island and which did not even recite that the land was island land. Plaintiff's Instructions 1 and 5, therefore, were erroneous in authorizing plaintiff's recovery without requiring either a finding that the descriptions in the deed covered all of the island south of the Sites boundary or a finding of the facts necessary to constitute title thereto by adverse possession. These instructions were, as follows:

(Instruction 1.) "The Court instructs the jury that if you find and believe from the evidence that the *plaintiff*, E. D. Smith, *purchased* from Cooper County, Missouri, in 1914, *some island land located* in that county, *and that other lands accreted to the land so originally purchased,* and that said land so purchased, and said accreted land or a part thereof, constitutes the land mentioned and described in the evidence, and that plaintiff thereafter entered into possession of said land and in 1920 cleared part of said land, and thereafter used said land for himself or rented it to tenants until 1930, then your verdict should be for the plaintiff and against the defendants Mary Wallace and Roscoe Wallace on the first count of the petition for an undivided one-half interest in the land described in the petition."

(Instruction 5.) "The Court instructs the jury that a purchaser of island land *is entitled to all accretions to the land so purchased, even though his deed may have described the land so purchased by metes and bounds* and as a definite number of acres. *The line of such purchaser extends to the water's edge,* and the purchaser assumes

the chance of his land being decreased by washing away or increased by accretion; and if it is increased such increase inures to him by operation of law.''

The italicized portions of these instructions taken together, instead of requiring a finding that there was accretion to the land described in plaintiff's deed, specifically stated that this was not necessary. This same question was discussed in Ancona Realty Co. v. Frazier, 328 Mo. 750, 41 S. W. (2d) 820, and the rule thus stated:

''Where alluvion or batture at the time of sale has attained a sufficient elevation to be susceptible of private ownership, it does not pass with the land unless so expressed in the act of sale. [Citing authorities.] In Frank v. Goddin, 193 Mo. 390, 397, 91 S. W. 1057, 112 Am. St. Rep. 493, it is conceded that a grantor may convey his upland by such boundaries, calls, and immutable lines and descriptions as would result in a reservation to the grantor of appurtenant flat lands and their present or subsequently accreted alluvion. [Citing authorities.] We think such was the effect of defendant's patent from Holt County and, consequently, he did not thereby acquire any interest in the land now in dispute. This instrument does not purport to convey an island as such with the river for a boundary, like the conveyances in Frank v. Goddin, supra; Dumm v. Cole County, 315 Mo. 568, 577, 287 S. W. 445; and similar cases.''

█ We think the situation here is the same because plaintiff bought only a part of an island from the county, and it appears that there was then other land to the southeast of the land described in his deed. There might be a jury question as to whether or not the southeastern part of the island lying in front of the Whittle farm in 1914, had at that time attained sufficient elevation to be susceptible of private ownership. But no such issue was submitted. Appellants further argue that the deed cannot be construed to cover any part of an island because of the recital that ''this is accreted land lying between the land of E. D. Smith and the Missouri River.'' However, that recital could not control over the metes and bounds in the deed, so this deed was good between the parties as to the land actually described wherever it was and even without formal acknowledgment shown. [See Elsea v. Smith, 273 Mo. 396, l. c. 441, 202 S. W. 1071.] Instruction No. 1 was the only instruction which hypothesized plaintiff's theory of the facts and authorized a verdict. Plaintiff had no such instruction covering the second count. █ Instruction No. 1 set out a theory not in accord with the evidence; or at least it was misleading and susceptible of the construction that it was based on the theory that the deed conveyed an entire island. Instruction No. 5 specifically stated that such a deed as plaintiff obtained gave him title (*at all events*) to the water's edge, and erroneously emphasized this error. Both instructions ignore plaintiff's own theory that he bought part of a large island, and that his part

became a separate island by being cut off from the larger one. We hold that the jury was not required to make a finding of fact issues essential to a verdict for plaintiff. Even the Harris instruction does not hypothesize all the factual elements necessary to constitute title by adverse possession. Therefore, this submission was reversible error.

Since this case must be retried, we will settle questions concerning the nature of the case and the state of the pleadings, which might otherwise cause some confusion at another trial. Appellants assigned as error the procedure followed by the trial court with reference to the issues between plaintiff and defendant Harris. The answer filed by Harris claimed an undivided one-half interest under the deed from plaintiff in 1929 and affirmatively asked the court "to adjudge, determine, settle, quiet and define the respective rights, title, interests and estates of plaintiff and defendants to said real property." Plaintiff filed a reply seeking to have this deed set aside on the ground that Harris agreed to give a note and deed of trust to secure the purchase price but that he did not do so and later agreed to reconvey to plaintiff. This reply also stated "that the said Harris did not take possession under said deed and the said real estate has remained in the possession of the plaintiff."

At the close of the evidence, the following occurred:

"Mr. DAVIS: If the Court please, the plaintiff dismisses as to the defendant Elmer Harris.

"The COURT: The plaintiff will be allowed to dismiss as to the defendant Harris if there is no objection on part of the defendant Harris.

"Mr. MARTIN: No objection. And the defendant Harris asks to withdraw his answer filed in the case."

Upon objection then made by appellants' counsel the court said: "I will leave the pleadings just like they are. . . . The Court is not permitting the withdrawal of the answer of defendant Harris nor dismissal of his answer. . . . Mr. Sapp: I want to understand this—is Harris in or out of this proceeding? The Court: The plaintiff dismissed as to Harris. Mr. SAPP: What is the theory of the Court on it—is he in or out? The COURT: Well, if you want to know what the Court thinks about it, I don't think he is out as far as these defendants Wallace are concerned."

The cause was then submitted to the jury on instructions, of both plaintiff and Harris, authorizing the jury to find Harris to be owner of an undivided one-half interest in the land, if plaintiff and Harris were found to own it as against the claims of appellants. Plaintiff's dismissal as to Harris eliminated the equitable issue between them, and the case was properly submitted to the jury as an action at law on the title issues between them and appellants. The equitable issue did not concern appellants and it would have been proper for the

court to try it separately from the law issues. [Sec. 951, R. S. 1929.] We hold that the dismissal of this part of the case as to Harris was proper and could not be prejudicial to appellants. In this connection, appellants say that the allegation in the reply to Harris' answer that "the said real estate has remained in the possession of plaintiff" was an admission that appellants were not "unlawfully in possession of the real estate in question," and precludes plaintiff's recovery on the ejectment count. However, plaintiff alleged that "on the second day of March, 1934, wrongfully entered into said premises and now unlawfully withhold from the plaintiff the possession thereof," and appellant Mary Wallace's answer stated that she "admits that she is in possession of the real estate described in the first count of plaintiff's first amended petition, except (a small part described)." [See Sec. 1372, R. S. 1929.] The allegation in the reply, in view of all the pleadings, must be construed to mean that plaintiff claimed Harris did not take possession against him after 1929, under the deed (he held under a lease as his tenant); and that Harris remained in possession only under him up to the time appellants took possession in 1931. We hold that this allegation cannot be construed so as to defeat plaintiff's right to ejectment against appellants. If plaintiff or Harris desire to amend their pleadings to make clearer the title issue between them and appellants, they should be permitted to do so. Other matters now urged will not be likely to occur again in the same way upon retrial.

The judgment is reversed and the cause remanded. *Ferguson* and *Bradley*, CC., concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.

*NOTE: Opinion filed at May Term, 1938, May 26, 1938; motion for rehearing filed; motion overruled at September Term, September 17, 1938.